# No. 24-50250

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CHRISTOPHER JOHN PETTIT,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Western District of Texas

———————

**BRIEF OF DEFENDANT-APPELLANT**

———————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
Tel.: (210) 472-6700
Fax: (210) 472-4454

KRISTIN M. KIMMELMAN
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

### UNITED STATES v. CHRISTOPHER JOHN PETTIT, No. 24-50250

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Christopher John Pettit,** Defendant-Appellant;

2. **Margaret F. Leachman,** Acting U.S. Attorney;

3. **Jaime Esparza,** former U.S. Attorney;

4. **Kelly G. Stephenson,** Assistant U.S. Attorney, and **Robert Almonte,** former U.S. Attorney, who represented Plaintiff-Appellee in the district court;

5. **Matthew T. Allen,** who represented Defendant-Appellant in the district court;

6. **Maureen Scott Franco,** Federal Public Defender;

7. **Alfredo R. Villarreal,** Assistant Federal Public Defender, and **Angela Saad Lindsey,** former Assistant Federal Public Defender, who represented Defendant-Appellant in the district court; and

8. **Kristin M. Kimmelman,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
*Attorney for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Christopher John Pettit requests oral argument. He argues that the district court plainly erred when it accepted his guilty plea after incorrectly advising him of the maximum possible punishment. He also argues one money laundering count had an insufficient factual basis. Argument would allow the parties to answer any questions this Court may have about the relevant facts and law.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................. i

STATEMENT REGARDING ORAL ARGUMENT ........................ iii

TABLE OF AUTHORITIES ............................................. vi

SUBJECT MATTER AND APPELLATE JURISDICTION ............ 1

ISSUES PRESENTED FOR REVIEW ..................................... 3

INTRODUCTION ........................................................ 4

STATEMENT OF THE CASE ........................................... 6

    A. Pettit was indicted on five wire fraud counts and three money laundering counts ........................................ 6

    B. Pettit pleaded guilty pursuant to a plea agreement to three wire fraud counts and three money laundering counts. ................................................................ 7

        1. The written plea agreement. ............................... 7

        2. The rearraignment hearing. .............................. 9

    C. Pettit was sentenced to 50 years' imprisonment, double the Sentencing Guidelines range. ..................................... 11

    D. The district court ordered over $106 million in restitution. ................................................................ 16

SUMMARY OF THE ARGUMENTS ..................................... 18

ARGUMENTS AND AUTHORITIES ..................................... 20

I.  The district court reversibly erred by misadvising Pettit of the maximum possible penalty, contrary to Rule 11, and then accepting Pettit's involuntary plea. ............................ 20

    A. The appeal waiver does not bar these claims ..................... 21

B. Standard of review. ........................................................... 22

C. The district plainly erred under Rule 11 by failing to inform Pettit of the maximum possible penalty for his guilty plea. .......................................................................... 23

    1. The district court did not correctly inform Pettit of the maximum possible penalty.................................... 23

    2. The Rule 11 error was obvious. ..................................... 27

    3. The error affected Pettit's substantial rights. .............. 29

    4. The Court should exercise its discretion to correct this error. ....................................................................... 33

D. Pettit's plea was unknowing and involuntary. ................... 35

II. The factual basis was insufficient to support Pettit's guilty plea to the money laundering alleged in Count Six. .............. 37

A. The appeal waiver does not bar this claim......................... 38

B. Standard of review. ........................................................... 38

C. The district court plainly erred by accepting Pettit's guilty plea for Count Six.................................................... 39

CONCLUSION................................................................................... 45

CERTIFICATE OF SERVICE ....................................................... 46

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ................................................................................................. 47

# TABLE OF AUTHORITIES

## Cases

*Boykin v. Alabama,*
   395 U.S. 238 (1969) ........................................................... 28, 35

*Brady v. United States,*
   397 U.S. 742 (1970) .................................................................. 35

*Puckett v. United States,*
   556 U.S. 129 (2009) ................................................22, 23, 38, 39

*Strickland v. Washington,*
   466 U.S. 668 (1984) .................................................................. 29

*United States v. Alvarado-Casas,*
   715 F.3d 945 (5th Cir. 2013) ....................................23, 27, 38, 39

*United States v. Amaya,*
   111 F.3d 386 (5th Cir. 1997) ........................................ 22, 35, 37

*United States v. Ammirato,*
   670 F.2d 552 (5th Cir. 1982) ................................................... 28

*United States v. Broussard,*
   669 F.3d 537 (5th Cir. 2012) ................................................... 40

*United States v. Carreon-Ibarra,*
   673 F.3d 358 (5th Cir. 2012) ........................................ 21, 22, 23

*United States v. Dominguez Benitez,*
   542 U.S. 74 (2004) .................................................................. 29

*United States v. Elias,*
   No. 19-20540, 2022 WL 1548865
   (5th Cir. May 16, 2022) (per curiam) .................................. 21, 22

*United States v. Freeman,*
   434 F.3d 369 (5th Cir. 2005) ................................................... 40

*United States v. Fuchs,*
    467 F.3d 889 (5th Cir. 2006) ...................................................... 40

*United States v. Garcia-Paulin,*
    627 F.3d 127 (5th Cir. 2010) ...................................................... 43

*United States v. Hildenbrand,*
    527 F.3d 466 (5th Cir. 2008) ............................................... 38, 39

*United States v. Johnson,*
    1 F.3d 296 (5th Cir. 1993) .......................................................... 29

*United States v. Jones,*
    969 F.3d 192 (5th Cir. 2020) ...................................................... 42

*United States v. Leahy,*
    82 F.3d 624 (5th Cir. 1996) ........................................................ 43

*United States v. Marek,*
    238 F.3d 310 (5th Cir. 2001) (en banc) ..................................... 40

*United States v. McCall,*
    833 F.3d 560 (5th Cir. 2016) ............................................... 38, 39

*United States v. Nepal,*
    894 F.3d 204 (5th Cir. 2018) ...................................................... 39

*United States v. Owens,*
    224 F. App'x 429 (5th Cir. 2007) (per curiam)........................... 44

*United States v. Palmer,*
    456 F.3d 484 (5th Cir. 2006) ............................................... 34, 44

*United States v. Pierre,*
    No. 20-30728, 2022 WL 1198222,
    (5th Cir. Apr. 22, 2022) (per curiam) ........................30, 33, 34, 35

*United States v. Powell,*
    354 F.3d 362 (5th Cir. 2003) ...................................................... 29

*United States v. Santiago,*
    96 F.4th 834 (5th Cir. 2024) ...................................................... 41

*United States v. Scott,*
    987 F.2d 261 (5th Cir. 1993) ...................................... 22

*United States v. Spruill,*
    292 F.3d 207 (5th Cir. 2002) ...................................... 44

*United States v. Trejo,*
    610 F.3d 308 (5th Cir. 2010) ...................................... 40

*United States v. Vonn,*
    535 U.S. 55 (2002) ...................................... 23, 39

*United States v. White,*
    307 F.3d 336 (5th Cir. 2002) ...................................... 21, 22

**Statutes**

18 U.S.C. § 1343 ..................................................... *passim*

18 U.S.C. § 1957 ..................................................... *passim*

18 U.S.C. § 1957(b)(1) ................................................. 24

18 U.S.C. § 1957(f)(1) ................................................. 40

18 U.S.C. § 1957(f)(2) ................................................. 40

18 U.S.C. § 3231 ....................................................... 1

18 U.S.C. § 3584(a) .................................................. 24

18 U.S.C. § 3742 ....................................................... 9

18 U.S.C. § 3742(a) .................................................... 1

28 U.S.C. § 1291 ..................................................... 1, 9

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ......................................... 1

Fed. R. App. P. 4(b)(2) ............................................... 2

Fed. R. Crim. P. 11 ............................................................ *passim*

Fed. R. Crim. P. 11(b)(1)(G) ........................................ 27

Fed. R. Crim. P. 11(b)(1)(H) ........................................ *passim*

Fed. R. Crim. P. 11(b)(3) ............................................... 39

Fed. R. App. P. 32(a)(5) ................................................ 47

Fed. R. App. P. 32(a)(6) ................................................ 47

Fed. R. App. P. 32(a)(7)(B) .......................................... 47

Fed. R. App. P. 32(f) .................................................... 47

Fed. R. Crim. P. 52(b) .................................................. 22

## U.S. Sentencing Guidelines

U.S.S.G. § 2B1.1(b)(10)(C) .......................................... 11

U.S.S.G. § 2B1.1(b)(2)(B) ............................................ 11

U.S.S.G. § 2B1.1(b)(9)(B) ............................................ 11

U.S.S.G. § 3B1.3 ........................................................... 11

U.S.S.G. § 3C1.1 ........................................................... 11

U.S.S.G. § 3E1.1 ........................................................... 12

U.S.S.G. § 3E1.1(b) ...................................................... 31

U.S.S.G. § 5G1.2(d) ...................................................... 12

U.S.S.G. § 5K1.1 ........................................................... 37

**SUBJECT MATTER AND APPELLATE JURISDICTION**

**1. Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of alleged offenses against the laws of the United States. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

**2. Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the United States District Court for the Western District of Texas entering a judgment of criminal conviction and sentence imposing a term of imprisonment. This Court has jurisdiction of the appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file a notice of appeal in the district court within 14 days after the judgment's entry. Fed. R. App. P. 4(b)(1)(A)(i). Here, the original judgment was entered on March 7, 2024. ROA.888. Pettit mailed his pro se notice of appeal 13 days later, on March 20, 2024. ROA.144. The notice of appeal was entered on April 3, 2024. ROA.889. An amended judgment was entered the next day. ROA.889–90. Pettit, both pro se and through counsel, filed motions to extend the notice of appeal deadline by 30 days in case the pro se notice of appeal was not deemed timely. ROA.163–67, 172–75. On

1

May 3, 2024, the magistrate judge held that Pettit's pro se notice of appeal was timely because it was deposited in the prison mail system within 14 days of entry of the original judgment. ROA.201. Alternatively, the notice of appeal was timely because the magistrate judge extended the deadline by 30 days.[1] ROA.201–02.

---

[1] Pettit also filed a timely notice of appeal on December 21, 2024, of the restitution order pronounced that same day. ROA.894, 907; *see* Fed. R. App. P. 4(b)(2). The district court entered a second amended judgment that included the restitution as ordered on January 6, 2025. ROA.916–26.

## ISSUES PRESENTED FOR REVIEW

1. Did the district court plainly err by failing to advise Pettit of the maximum possible penalty as required by Rule 11?

2. Did the district court plainly err by accepting Pettit's unintelligent and involuntary guilty plea after incorrectly advising him of the maximum possible penalty?

3. Did the district court plainly err by accepting Pettit's guilty plea to Count Six, money laundering, because the factual basis did not establish that the transferred money was derived from a specified unlawful activity?

## INTRODUCTION

After Christopher John Pettit filed for bankruptcy, the government indicted him on five counts of wire fraud and three counts of money laundering. Pettit pleaded guilty pursuant to a plea agreement to six of the eight charges. In exchange for Pettit's guilty plea, the government agreed to dismiss two wire fraud counts involving transfers from a particular trust account in January 2020.

During the rearraignment hearing, the district court told Pettit that the maximum prison term was 20 years for wire fraud and 10 years for money laundering. The court suggested that the sentences on those two offenses could be run consecutively, but the court never informed Pettit that the maximum term applied to each count and that all six counts could be run consecutively to each other, resulting in a maximum total punishment of 90 years' imprisonment. The plea agreement also failed to advise Pettit of the possible 90-year prison term. And while the plea agreement contained a factual basis for the plea, it lacked any facts establishing that the monetary transaction in Count Six, a money laundering charge, was of funds from a specified unlawful activity, an essential element of the crime.

Despite the misinformation regarding the maximum penalty and the lack of factual support for Count Six, the district court

accepted Pettit's plea of guilty to Counts Three through Eight. The court sentenced Pettit to 50 years' imprisonment—twice the recommended Sentencing Guidelines range.

Pettit asks the Court to reverse his convictions, vacate his guilty plea, and remand the case to allow him to plead anew or proceed to trial. Alternatively, the conviction of Count Six should be vacated because the factual basis failed to establish that the alleged money laundering involved funds from any wire fraud offense.

## STATEMENT OF THE CASE

Christopher John Pettit had been a practicing attorney in San Antonio, Texas, for decades. ROA.596–97. His firm, Chris Pettit and Associates, PC, offered clients legal services and investment opportunities, including 1031 exchanges,[2] estate planning, escrow services and investment in bonds. ROA.555. But he filed for bankruptcy and resigned his law license in June 2022. ROA.585.

### A. Pettit was indicted on five wire fraud counts and three money laundering counts.

In December 2022, the government indicted Pettit for five counts of wire fraud and three counts of money laundering, in violation of 18 U.S.C. §§ 1343 and 1957, respectively. ROA.17–23. The indictment alleged that Pettit engaged in a scheme to defraud clients by inducing clients to deposit money with his firm based on false representations regarding the creation of a trust, investment in high-percentage-return bonds, or serving as a qualified intermediary in a 1031 exchange.

---

[2] A 1031 exchange allows capital gains taxes to be deferred while a person sells qualifying property and uses those funds to purchase another qualifying property. ROA.582.

**B. Pettit pleaded guilty pursuant to a plea agreement to three wire fraud counts and three money laundering counts.**

In October 2023, Pettit pleaded guilty to six counts—Counts Three through Eight—pursuant to a plea agreement. ROA.222, 239, 553. In exchange for his guilty plea, the government promised to dismiss Counts One and Two, which alleged wire fraud involving transfers from a trust account for alleged victim S.O. in January 2020. ROA.22, 218, 221, 553.

**1. The written plea agreement.**

The plea agreement specified that the maximum prison term for "Counts 3–5: 18 U.S.C. § 1343 – Wire Fraud" was 20 years, and the maximum prison term for "Counts 6–8: 18 U.S.C. § 1957 – Money Laundering" was 10 years. ROA.553–54. The agreement did not explain that the district court could impose consecutive sentences for each count. *See* ROA.553–67. Nor did the agreement identify that the maximum possible imprisonment for the guilty plea was 90 years. *See* ROA.553–67. The agreement simply said, "Defendant knows the Court has authority to impose any sentence up to the maximum statutory penalty." ROA.554.

The plea agreement included a factual basis. ROA.556–58; *see* ROA.22. For the money laundering counts alleged in Counts Six

through Eight, the factual basis stated that Pettit "did knowingly engage and attempt to engage in monetary transactions, in and affecting interstate and foreign commerce, by and through a financial institution, in criminally derived property of a value greater than $10,000, … such property having been derived from specified unlawful activity, to wit:" wire fraud under § 1343. ROA.559. The only factual support for the money laundering alleged in Count Six was that "[o]n or about January 17, 2020, Defendant transferred $800,00 from an Account in Texas to an Account in California … to a title company for the purchase of a Florida Property in Defendant's interest." ROA.559. The factual basis did not describe any wire fraud in January 2020 that may have been related to the $800,000 transfer, nor did it provide any other explanation for the origins of that money or the unidentified "Account in Texas." *See* ROA.555–59.

The factual basis stipulated that Pettit admitted that the loss amount is no less than $20 million and no more than $65 million. ROA.559. But Pettit agreed that the district court would impose restitution and that the restitution amount may be greater than the loss he agreed to. ROA.565. Pettit also agreed "that the Court will

determine the total sum of restitution involving the charged crime and relevant conduct." ROA.564–65.

The plea agreement included an appeal waiver:

> In exchange for the concessions made by the United States in this agreement, Defendant voluntarily and knowingly waives the right to appeal the conviction or sentence on any ground, including any challenge to the constitutionality of the statute of conviction; any claim that Defendant's conduct did not fall within the scope of the statute of conviction; any challenges to the determination of any period of confinement, monetary penalty or obligation, restitution order or amount, term of supervision and conditions; and any other claim based on rights conferred by 18 U.S.C. § 3742 or 28 U.S.C. § 1291.

ROA.560–61. The waiver continued, "Defendant, knowing that the sentence has not yet been determined by the Court, waives the right to challenge the sentence imposed[.]" ROA.561.

## 2. The rearraignment hearing.

At rearraignment, the district court placed Pettit under oath, advised him of the rights he would be waiving by pleading guilty, and asked him a series of questions before accepting his guilty plea. *See* ROA.218–41. Pettit said he understood the rights he was waiving and that he was pleading guilty voluntarily because he was guilty. ROA.223–27.

Regarding the sentencing exposure, the prosecutor explained that there were multiple counts but "essentially two charges, the wire fraud and the money laundering." ROA.221. The court repeated the statutory maximum for each type of offense: 20 years for wire fraud, and 10 years for money laundering. ROA.221.

The district court later asked Pettit if he understood "that the maximum possible penalty for wire fraud in Counts Three through Five is 20 years imprisonment." ROA.228. Pettit responded affirmatively. ROA.228. The court then asked if he understood "that the maximum possible penalty for money laundering in Count Six to Eight is ten years of imprisonment," and Pettit responded, "Yes." ROA.228. The court continued, "And you understand that if you plead guilty to both counts, and knowing those maximum terms, those sentences can be—can run consecutive." ROA.228. Pettit responded, "Yes, sir." ROA.228. The court did not ask if Pettit understood that he could receive consecutive sentences for *each* of the six counts, for a total possible punishment of 90 years. *See* ROA.228–29.

The government summarized the evidence it would present if the case had gone to trial, largely summarizing the factual basis included in the plea agreement. ROA.233–37. Pettit agreed with

the summary and said that was what he did. ROA.239. He then pleaded guilty, and the district court accepted the guilty plea. ROA.239–40.

## C. Pettit was sentenced to 50 years' imprisonment, double the Sentencing Guidelines range.

**Presentence report.** Before sentencing, the probation officer prepared a presentence report that calculated the advisory Sentencing Guidelines range as 235 to 293 months' imprisonment. ROA.597. This was based on a total offense level of 38 and criminal history category I. ROA.597. The driving factor for the offense level was the loss amount, to which Pettit had agreed in the plea agreement: more than $25 million but less than $65 million. ROA.559, 589; *see* U.S.S.G. § 2B1.1(b)(2)(B). This loss amount resulted in a 22-level increase from the base offense level of seven. ROA.589. Pettit also received a four-level increase for the offense causing substantial financial hardship to at least five or more victims, and two-level increases each for fraudulent action during a bankruptcy proceeding, the offense involving sophisticated means, the abuse of a position of trust, and obstruction of justice. ROA.589; *see* U.S.S.G. §§ 2B1.1(b)(2)(B), (b)(9)(B), (b)(10)(C); 3B1.3; 3C1.1. Pettit's offense

11

level was reduced by 3-levels because he accepted responsibility. ROA.589–90; *see* U.S.S.G. § 3E1.1.

The presentence report specified that the maximum term of imprisonment was 20 years per wire fraud count and 10 years per money laundering count, but it did not otherwise address the maximum possible punishment of 90 years or explain how the district court could run the sentences consecutively to reach a sentence within the Guidelines range of 235 to 293 months. ROA.597.

**Sentencing memoranda.** The government filed a sentencing memorandum arguing for a sentence at the top of the Guidelines range: 293 months, over 24 years' imprisonment. ROA.739. Such a sentence, the government explained, would "account for the harm Pettit wrought on the community and on his victims." ROA.739. Accordingly, the government asked for "at least two of Pettit's counts of conviction to run consecutively to reach the high-end of the Guideline range." ROA.742; *see* U.S.S.G. § 5G1.2(d).

Pettit's sentencing memorandum acknowledged that Pettit's plea exposes him "to a statutory imprisonment term of not more than 20 years on the Wire Fraud Counts and up to 10 years on the Money Laundering Counts with the possibility of running concurrent or consecutive." ROA.831. But he asked for a sentence of 120

months, below the Guidelines range, highlighting that Pettit was already 56 years old with a myriad of health concerns and with one desire: to see his then-11-year-old son outside of prison again. ROA.831, 833.

The memorandum emphasized that, instead of refusing to cooperate and forcing long and costly proceedings in both the bankruptcy and this criminal case, Pettit gave up his homestead to help pay creditors and pleaded guilty. ROA.832–33. The same day the indictment was filed, the bankruptcy court had approved a settlement agreement "surrendering almost all his exempt property for the benefit of the creditors." ROA.848; *see* ROA.840. Defense counsel asked the court to send a message that fraudulent behavior must "be punished but that you will benefit from taking responsibility and cooperating." ROA.832–33.

To support his downward variance request, Pettit submitted excerpts from the bankruptcy hearing transcript in which the bankruptcy court explained that Pettit did not have to surrender that property. ROA.848. "He could have contested it. The trustee would have had to put on evidence. It would have been a lengthy trial. There would have been the incurrence of further legal fees, appropriate defenses, and then the Court would have had to take the

laboring task of sifting through all this evidence," meaning further delay plus a possible appeal. ROA.848. Instead, Pettit's willingness to surrender his exempt property resulted in "peace" and "provides finality." ROA.848. As the bankruptcy court put it, "to say that this is a favorable settlement for the estate is an understatement." ROA.848.

**Sentencing hearing.** At sentencing, the district court confirmed that Pettit had reviewed the presentence report and that he was aware the possible sentence he could receive was "anywhere from 235 months to 293 months" or that "the Court is free to go beyond that to the statutory cap." ROA.261. The court heard from the parties, Pettit, and several victims. ROA.243–331. Many other victims were in the gallery with their attorneys, and the court had reviewed over 30 letters from victims.[3] ROA.255, 284–310. The government reiterated its request for a sentence at the top of the Guidelines: "We don't often ask for a sentence that's above the statutory maximum. But we're asking you to stack the sentences to get

---

[3] Pettit requested that the record be supplemented with the victim's letters and that the supplemented items be placed under seal. That request is pending.

there." ROA.282. The court then asked if the government would oppose a sentence above the Guidelines, and the prosecutor responded that it would not. ROA.283.

When Pettit spoke, the district court invited him to turn to the gallery and address the victims. ROA.316. He did so, apologizing to them and pledging to do "everything within my power to help you get your money back." ROA.316.

The district court sentenced Pettit to an aggregate 50 years' imprisonment. ROA.326. Specifically, the court imposed sentences of 180 months' imprisonment in each of the three wire fraud counts, to run consecutively to each other for a total of 540 months. ROA.326. On the money laundering counts, the court imposed sentences of 60 months in each count to run concurrently to each other but consecutively to the wire fraud counts, for a total of 600 months. ROA.326. The court also imposed a $600 special assessment—$100 for each count of conviction—and supervised release of three years on each count. ROA.324. The court ordered forfeiture of $65 million and noted that the restitution hearing would happen later. ROA.327, 330; *see* ROA.127.

**D. The district court ordered over $106 million in restitution.**

The restitution hearing was held months after the sentencing hearing, as the government did not have sufficient information at the time of sentencing to support a restitution order. *See* ROA.118–19, 587, 893–94. The government explained that, due to the number of victims, the time period, the lack of recordkeeping, and the complexity of the scheme, restitution was "complex and difficult to calculate." ROA.118–19.

To determine the restitution amount, the government and the probation officer developed a questionnaire for alleged victims to complete. ROA.187. That questionnaire requested information regarding the amount of money entrusted to Pettit and the amount they received from him ROA.193–99. The questionnaire did not request information about the terms of the agreement under which the money was provided to Pettit, such as whether it was to create a trust, invest in bonds, participate in 1031 exchange, or some other matter. ROA.193–99. Nor did the questionnaire ask whether the victim had evidence that Pettit had used the money for the intended purpose or not. ROA.193–99. In other words, the questionnaire did

not seek to establish that the money lost was part of a fraudulent scheme.

At the restitution hearing, the government requested restitution of over $106 million for 98 victims. ROA.933. The prosecutor explained that the financial records it had obtained from Pettit went back to about 2017, but "the scope of the harms to the victims went far beyond that." ROA.934. So the government relied on the victim questionnaires to support the final restitution amount. ROA.935. But the government made no separate showing that each victim was the subject of fraud. ROA.931–1009; *see* ROA.1031–63. Pettit objected to the lack of proof supporting the restitution order. ROA.980, 1007. The district court imposed the requested restitution amount of $106,273,364.17. ROA.921–25.

**Appeals.** Pettit appealed from the original sentencing and the restitution order. ROA.143, 907. The notices of appeal were both docketed in this case on appeal.

# SUMMARY OF THE ARGUMENTS

## I. The district court reversibly erred by misadvising Pettit of the maximum possible penalty, contrary to Rule 11, and then accepting Pettit's involuntary plea.

Pettit raises two arguments regarding the district court's plea colloquy regarding the maximum possible penalty. These arguments are discussed together because they share similar facts and rely on similar precedent. Each argument is an independent ground for reversal, and neither is barred by the appeal waiver.

First, the district court did not comply with Federal Rule of Criminal Procedure 11's requirement to advise a defendant of "any maximum possible penalty." Fed. R. Crim. P. 11(b)(1)(H). The court failed to ensure that Pettit understood, before pleading guilty, that he faced a maximum prison sentence of 90 years. Instead, the court admonished Pettit of, at most, a maximum 30-year sentence. This error was clear under the plain language of Rule 11 and this Court's precedent. The error affected Pettit's substantial rights because, had Pettit been properly advised of the maximum possible prison sentence, he would not have entered the plea. The Court should reverse Pettit's convictions, vacate his guilty plea, and remand to allow him to plead anew or proceed to trial.

Second, by misadvising Pettit of the maximum possible penalty, the district court rendered Pettit's plea unintelligent and involuntary. Thus, the court erred by accepting the involuntary plea. The obvious error affected Pettit's substantial rights because, had Pettit been properly advised of the maximum possible prison sentence, he would not have entered the plea. The Court should reverse Pettit's convictions, vacate his guilty plea, and remand to allow him to plead anew or proceed to trial.

## II. The factual basis was insufficient to support Pettit's guilty plea to the money laundering alleged in Count Six.

The factual basis for the money laundering alleged in Count Six did not establish that the transferred money was derived from a specified unlawful activity. Given the insufficient factual basis, the district court plainly erred by accepting Pettit's guilty plea as to that count. This argument is not barred by the appeal waiver, and the Court should vacate the conviction for Count Six.

## ARGUMENTS AND AUTHORITIES

**I.  The district court reversibly erred by misadvising Pettit of the maximum possible penalty, contrary to Rule 11, and then accepting Pettit's involuntary plea.**

The district court's plea colloquy did not comply with Federal Rule of Criminal Procedure 11 because it failed to ensure that Pettit understood, before pleading guilty, that he faced a maximum prison sentence of 90 years. *See* Fed. R. Crim. P. 11(b)(1)(H). Instead, the court admonished Pettit of a maximum 30-year sentence. This Rule 11 error and misinformation rendered Pettit's plea involuntary. The appeal waiver does not bar this claim, and the court's clear error affected Pettit's substantial rights. Had Pettit been properly advised of the maximum possible prison sentence, he would not have entered the plea. The Court should reverse Pettit's convictions based on either the Rule 11 error or because the plea was involuntary,[4] vacate his guilty plea, and remand the case to allow him to plead anew or proceed to trial.

---

[4] Pettit discusses these arguments together because they share similar facts and rely on similar precedent, but each argument is an independent ground for reversal.

**A.  The appeal waiver does not bar these claims.**

Pettit pleaded guilty pursuant to a plea agreement with an appeal waiver. ROA.560–62. Appeal waivers, however, "cannot be enforced 'to bar a claim that the waiver itself—or the plea agreement of which it was a part—was unknowing or involuntary.'" *United States v. Carreon-Ibarra*, 673 F.3d 358, 362 n.3 (5th Cir. 2012) (quoting *United States v. White*, 307 F.3d 336, 343 (5th Cir. 2002)). Pettit's appeal waiver was unknowing and involuntary because it was part of an agreement he entered into without knowing that the maximum possible punishment was 90 years' imprisonment. He argues this, in combination with or independently from the district court court's Rule 11 error, rendered his plea unknowing and involuntary. Enforcing the appeal waiver to bar his argument that his plea was unintelligent and involuntary "would lead to 'impermissible boot-strapping.'" *United States v. Elias*, No. 19-20540, 2022 WL 1548865, at *2 (5th Cir. May 16, 2022) (per curiam) (quoting *White*, 307 F.3d at 343).

Indeed, this Court has declined to enforce an appeal waiver in similar circumstances. In *Carreon-Ibarra*, the defendant's claim was that his plea agreement was unknowing and involuntary because the district court had incorrectly advised him of his

mandatory minimum sentence. 673 F.3d at 362 n.3 (vacating the guilty plea as to the count with the improper admonishment). The Court refused to enforce the appeal waiver because the waiver cannot insulate the voluntariness of the plea agreement that includes the waiver from review. *Id.* (citing *White*, 307 F.3d at 343). The Court applied the same reasoning in *Elias* and held that the appeal waiver did not bar his Rule 11 claim. 2022 WL 1548865, at *2. Thus, the Court can consider Pettit's Rule 11 and involuntary plea challenges on the merits despite the appeal waiver.

## B. Standard of review.

Rule 11 errors and the voluntariness of a guilty plea are both reviewed *de novo*. *See United States v. Amaya*, 111 F.3d 386, 388 (5th Cir. 1997); *United States v. Scott*, 987 F.2d 261, 264 (5th Cir. 1993). If either claim is raised for the first time on appeal, challenges are generally reviewed for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Vonn*, 535 U.S. 55, 59 (2002); *United States v. Reyes*, 300 F.3d 555, 558 (5th Cir. 2002). To show plain error, Pettit must show (1) an error that is (2) "clear or obvious, rather than subject to reasonable dispute" and that (3) affects his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). When these prongs are satisfied, this Court exercises its discretion to

remedy an error if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.*

## C. The district plainly erred under Rule 11 by failing to inform Pettit of the maximum possible penalty for his guilty plea.

"Guilty pleas must be made intelligently and voluntarily because they involve the waiver of several constitutional rights." *Carreon-Ibarra*, 673 F.3d at 364. Rule 11 "was designed to 'ensure that a guilty plea is knowing and voluntary, by laying out the steps a trial judge must take before accepting such a plea.'" *United States v. Alvarado-Casas*, 715 F.3d 945, 949 (5th Cir. 2013) (quoting *Vonn*, 535 U.S. at 58). One requirement is that, before accepting a plea of guilty, "the court must inform the defendant of, and determine that the defendant understands, ... any maximum possible penalty, including imprisonment, fine, and term of supervised release." Fed. R. Crim. P. 11(b)(1)(H). The district court failed to do so here. That error was obvious, affected Pettit's substantial rights, and warrants reversal.

### 1. The district court did not correctly inform Pettit of the maximum possible penalty.

Pettit pleaded guilty to three wire fraud counts and three money laundering counts (Counts Three through Eight of the indictment)

pursuant to a plea agreement in which the government also agreed to dismiss the remaining counts (Counts One and Two). ROA.218; *see* ROA.553–54. The maximum term of imprisonment for each wire fraud count was 20 years, and the maximum term of imprisonment for each money laundering count was 10 years. 18 U.S.C. §§ 1343, 1957(b)(1). Thus, the maximum possible penalty for Pettit's plea was 90 years' imprisonment because the district court could choose to run the sentences consecutively. *See* 18 U.S.C. § 3584(a) ("If multiple terms of imprisonment are imposed on a defendant at the same time, … the terms may run concurrently or consecutively[.]").

But the district court did not inform Pettit of that 90-year exposure during the rearraignment hearing. *See* ROA.221, 228. Nor did the court ensure that Pettit understood he was pleading guilty to a possible 90-year sentence. *See* ROA.227–28.

Near the beginning of the hearing, the prosecutor described the plea agreement as the "standard plea agreement" that "outlines the statutory range of punishment for *both counts*, wire fraud and the 1957 money laundering." ROA.221 (emphasis added). The court then asked, "There are two counts, right?" ROA.221. The prosecutor responded: "Two counts. Yes, Your Honor. There's multiple counts, but essentially *two charges*, the wire fraud and the money

laundering." ROA.221 (emphasis added). The court repeated the statutory maximum for each of the *charges*: 20 years for wire fraud, and 10 years for money laundering. ROA.221.

Later in the proceeding, the court asked Pettit if he understood the maximum possible penalties:

> THE COURT: Do you understand *the maximum possible penalty for wire fraud in Counts Three through Five* is 20 years imprisonment?
>
> DEFENDANT PETTIT: Yes.
>
> THE COURT: And you understand that *the maximum possible penalty for money laundering in Count Six to Eight* is ten years of imprisonment?
>
> DEFENDANT PETTIT: Yes.
>
> THE COURT: And you understand that if you plead guilty to *both counts*, and knowing those maximum terms, those sentences can be -- *can run consecutive*.
>
> DEFENDANT PETTIT: Yes, sir.

ROA.228 (emphasis added). The court left Pettit with the impression that the maximum possible punishment for all three wire fraud counts together was 20 years, and the maximum possible punishment for all three money laundering counts together was 10 years.

ROA.228. The court then explained that the sentences for "both counts" could run consecutively. ROA.228.

Throughout the rearraignment hearing, the prosecutor and district court referred to "both counts," "two counts," and "two charges." ROA.221, 228. In context, the natural understanding of the court's explanation was that the wire fraud maximum (20) and the money laundering maximum (10) can run consecutively. At best, the court informed Pettit that the maximum possible penalty for his guilty plea was 30 years. *See* ROA.228. The court never clarified that Pettit could receive consecutive sentences for *each* of the six counts, for a total possible punishment of 90 years. *See* ROA.228.

The written plea agreement, which Pettit had reviewed and signed, ROA.222, did not inform Pettit that he could receive up to 90 years in prison for pleading guilty either. For each type of offense, the plea agreement listed the maximum prison term—20 years for wire fraud, 10 years for money laundering—as well as the maximum term of supervised release, fine, and monetary assessment. ROA.553–54. The agreement also specified that Pettit "knows the Court has authority to impose any sentence up to the maximum statutory penalty." ROA.554. But the agreement never

specified that sentences for each count could run consecutively or that the maximum possible term of imprisonment is 90 years. *See* ROA.553–54. Thus, the district court did not, either in person or by confirming that Pettit had reviewed the plea agreement, "inform the defendant of, and determine that the defendant understands … any maximum possible penalty[.]" Fed. R. Crim. P. 11(b)(1)(H).

### 2. The Rule 11 error was obvious.

This Court has held that Rule 11 is clearly violated when a district court informs the defendant of an incorrect, lower maximum penalty. *Alvarado-Casas*, 715 F.3d at 954 ("for the district court to inform him that he faced only a ten-year maximum sentence" when the maximum was 20 years "was clear and obvious"). Here, the district court incorrectly informed Pettit that the maximum possible penalty was 30 years, not 90. *Supra* Section I.C.1.

This misinformation clearly violated Rule 11. Rule 11 specifies that the court must determine that the defendant understands "*any maximum possible penalty*" before accepting the plea of guilty. Fed. R. Crim. P. 11(b)(1)(H) (emphasis added). Unlike Rule 11(b)(1)(G), which requires the court to inform the defendant of the "nature of *each charge* to which the defendant is pleading" (emphasis added), Rule 11(b)(1)(H) is not limited to informing the defendant of the

statutory maximum for *each charge* to which the defendant is pleading. Instead, Rule 11(b)(1)(H) uses broad, expansive language, requiring the defendant to be informed of "*any* maximum *possible* penalty*,*" without limiting the information to a specific charge or count. Fed. R. Crim. P. 11(b)(1)(H) (emphasis added).

Such breadth makes sense. "What is at stake for an accused facing … imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243–44 (1969). The point of the Rule 11 procedures is to ensure that the defendant understands the consequences of his decision to plead guilty. *United States v. Ammirato*, 670 F.2d 552, 555 (5th Cir. 1982). Informing a defendant "of the maximum aggregate sentence" he could receive satisfies Rule 11's purpose. *Id.* at 555. Such information is also more helpful to a defendant who, like Pettit, ROA.553, indicates his desire to plead to multiple counts, than simply informing the defendant of the statutory maximum of each type of offense. *Ammirato*, 670 F.2d at 555 n.2. What Pettit "needed to know was the total penalty to which he was exposing himself." *Id.* Failing to inform him of

this was clear error under this Court's precedent and the plain language of Rule 11(b)(1)(H).

### 3. The error affected Pettit's substantial rights.

"[A] defendant who seeks reversal of his conviction after a guilty plea, on the ground that the district court committed plain error under Rule 11, must show a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004). The Court reviews the entire record to determine whether "the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). The focus for this inquiry is on "whether the defendant's knowledge and comprehension of the full and correct information would have been *likely to affect* his willingness to plead guilty." *United States v. Powell*, 354 F.3d 362, 367 (5th Cir. 2003) (quoting *United States v. Johnson*, 1 F.3d 296, 302 (5th Cir. 1993)) (emphasis added).

But for the misinformation about the maximum possible penalty he was facing, Pettit would not have entered his guilty plea. He would have gone to trial, negotiated a more beneficial plea agreement, or pleaded guilty without a plea agreement. Pettit was 56

years old when he pleaded guilty, and his one wish was to be able to see his son outside of prison again. ROA.578, 833. With a maximum punishment of 30 years, given the time he had served and the operation of good time and other credits, release before death was possible. With a maximum punishment of 90 years, however, being released before death becomes increasingly less likely, depending on the sentence actually imposed.

Moreover, Pettit received no actual benefit in exchange for his plea of guilty and the waiver of important constitutional rights and the right to appeal. The only pure concession the government offered in the plea agreement was to dismiss two of the eight counts against him, reducing his sentencing exposure from 130 years to 90 years. ROA.553. "At the surface level," this was an "incentive to plead guilty." *United States v. Pierre*, No. 20-30728, 2022 WL 1198222, at *4 (5th Cir. Apr. 22, 2022) (per curiam). "But the surface is as deep as that … benefit goes." *Id.* Counts One and Two were wire fraud offenses like Counts Three through Five, so their dismissal simply reduced Pettit's sentencing exposure from 130 years to 90 years. ROA.553. That is not a real benefit to anyone, much less a 56-year-old man. Moreover, given Pettit's agreement that his offense involved loss up to $65 million and the operation of relevant

30

conduct, the dismissal of Counts One and Two did not affect his Sentencing Guidelines range. ROA.559; *see* ROA.579–80, 588–89.

The agreement's other benefit was conditional and illusory: the government agreed to "not oppose Defendant's receiving the maximum applicable downward adjustment for acceptance of responsibility under the guidelines" as long as Pettit does not engage in certain behavior that would demonstrate lack of acceptance of responsibility. ROA.562. The maximum reduction for acceptance of responsibility, however, requires a government *motion* stating the defendant had assisted authorities in the investigation or prosecution of his own misconduct. U.S.S.G. § 3E1.1(b). Non-opposition is insufficient. So the promise to not oppose acceptance, if Pettit did not engage in any of the conduct listed, would only apply to the first two acceptance points and would not be binding on the district court.[5]

Similarly, the government promised "to *consider* filing a motion for sentence reduction" *if* Pettit provides "substantial assistance" to the government, but left to itself the sole discretion to determine whether any assistance warrants a reduction motion. ROA.570. But

---

[5] In the end, Pettit received a three-level reduction for acceptance of responsibility. ROA.589–90.

the government can request a sentence reduction regardless of whether a defendant entered into a plea agreement. So this promise to *consider* whether to file a reduction motion offers no real benefit to Pettit and is unenforceable.

By contrast, the government benefited greatly from Pettit's agreement that the loss amount was more than $25 million but less than $65 million. *See* ROA.559. It obtained a forfeiture order for $65 million based on that agreement, ROA.111, 926, and a 22-level increase to Pettit's offense level that it would have had difficulty proving. Indeed, by the language of the plea agreement, the government was not limited to argue that loss was less than $65 million. ROA.559, 562. It could have sought to prove greater loss, but it did not. *See* ROA.257 (government relied on plea agreement's loss amount). And the government avoided the difficulties of proving a fraud offense at trial. *Cf.* ROA.848 (describing complexity of bankruptcy trials).

Had Pettit been properly informed that he was facing over 30 years in prison, he would have sought a more favorable plea agreement, pleaded guilty without an agreement, or gone to trial for a fighting chance at seeing his son outside prison one last time or negotiated terms of a plea agreement based on correct information

about his sentencing exposure. *See* ROA.833; *see also Pierre*, 2022 WL 1198222, at *4 (finding there was a reasonable probability that defendant would not have entered the plea if he understood that the benefit promised by the government was illusory).

Pettit's pro se efforts to file his notice of appeal and withdraw his trial counsel indicate his willingness to go to trial. *See* ROA.135–40, 172–73. Pettit also opposed the restitution order, holding the government to its burden. *See* ROA.970, 978–80, 1007. As the restitution process demonstrates, proving the nexus between money lost and fraud was difficult in this case because of the complexity of the alleged fraud, the lack of records, and the limited amount of information the government had obtained. ROA.118–19, 934–38. Even proving the amount Pettit's clients lost, regardless of whether it was connected to fraud, was difficult. *See* ROA.986–89 (agent's testimony regarding process of gathering information for restitution). Had Pettit known he was facing the possibility of 90 years in prison, he would not have entered the plea.

## 4.  The Court should exercise its discretion to correct this error.

"The right to a jury trial is one of the primary constitutional safeguards for fairness and integrity in judicial proceedings."

*Pierre*, 2022 WL 1198222, at *5. Consequently, "[t]he integrity of the plea bargaining system," which results in a defendant relinquishing that important right, "is vital to our national system of criminal justice." *United States v. Palmer*, 456 F.3d 484, 491 (5th Cir. 2006) (cleaned up). "Maintaining that integrity requires diligently policing its failure to function properly." *Id.*

Here, Petitt entered a guilty plea pursuant to a plea agreement that conveyed no real benefit to him after being misinformed of the maximum possible penalty. The district court misinformed Pettit about the maximum possible penalty he faced by pleading guilty to the six counts, indicating that Pettit faced a maximum term of imprisonment of 30 years, substantially lower than the 90 years he actually faced. *Supra* Section I.C.1. Then the court sentenced Pettit to 50 years, even though the government—who was in the best position to know the strength of its case and the value of Pettit's efforts to cooperate with the bankruptcy and victims—requested about 24 years, the top of the Guidelines range. ROA.282, 326, 739. These circumstances—an unknowing and involuntary guilty plea because of a Rule 11 error—seriously affect the fairness, integrity, and public reputation of judicial proceedings and warrant reversal because Pettit "lost the opportunity to pursue a more favorable

outcome in a manner consistent with his fundamental rights—either by going to trial or by negotiating a different plea agreement founded on accurate assumptions." *Pierre*, 2022 WL 1198222, at *5 (exercising discretion to vacate judgment and plea).

### D. Pettit's plea was unknowing and involuntary.

Even if the Court determines the district court's Rule 11 admonishment does not amount to plain error, the district court plainly erred by accepting Pettit's unknowing and involuntary guilty plea. "A situation in which a defendant is induced by … misrepresentation to enter a plea of guilty does not meet the standard for voluntariness articulated by the Supreme Court." *Amaya*, 111 F.3d at 389 (vacating guilty plea). Pettit lacked a "full understanding of what the plea connotes and of its consequence" because he was misadvised as to the maximum possible penalty. *Boykin v. Alabama*, 395 U.S. 238, 244 (1969). The court thus erred by accepting the involuntary plea.

This error was clear because a guilty plea must be entered by someone "fully aware of the direct consequences" of that plea. *Brady v. United States*, 397 U.S. 742, 755 (1970). It was obvious that the maximum possible sentence was 90 years. *See supra* Section I.C.1. But the court failed to explain that and instead advised Pettit of a

maximum possible sentence of 30 years. ROA.28; *see supra* Section I.C.1. The plea agreement similarly failed to clarify the possible sentencing exposure, ROA.553–54, and the record does not indicate Pettit was otherwise informed of the maximum possible sentence of 90 years before pleading guilty.

Even the parties' sentencing memoranda contained no hint that they contemplated a sentence over 30 years. The prosecutor requested consecutive sentences to reach close to just over 24 years, staying within the Guidelines range. ROA.739. And defense counsel's memorandum suggested a maximum possible sentence to be 30 years. ROA.739, 831 (describing the statutory maximum as "not more than 20 years on the Wire Fraud Counts and up to 10 years on the Money Laundering Counts with the possibility of running concurrent or consecutive"). These sentencing arguments suggest that the parties had not discussed, and Pettit was not advised of, the possibility that he could be sentenced to more than 30 years' imprisonment.

Pettit was pleaded guilty under the misimpression that his sentence was limited to 30 years' imprisonment. This Court has held a plea to be involuntary and unknowing in a similar situation where the defendant pleaded guilty under the mistaken belief about

sentencing exposure. *Amaya*, 111 F.3d at 389–90. In *Amaya*, the district court's comments at rearraignment suggested that it would consider at sentencing whether Amaya warranted a sentencing departure for substantial cooperation under guideline § 5K1.1 even if the government did not move for a downward departure. 111 F.3d at 388–89. But the court's assurances misrepresented its authority to address substantial assistance under the then-mandatory Guidelines without a motion from the government. *Id.* This Court held that Amaya's guilty plea was involuntary. *Id.* at 389.

Under a straightforward application of this Court's precedent, Pettit's guilty plea was unknowing and involuntary. For the reasons expressed above, the obvious error of accepting Pettit's involuntary guilty plea affected Pettit's substantial rights. *See supra* Section I.C.3. He would not have pleaded guilty but for the misinformation. The Court should exercise its discretion to reverse his convictions, vacate his guilty plea, and remand to allow him to plead anew or proceed to trial. *See supra* Section I.C.4.

## II. The factual basis was insufficient to support Pettit's guilty plea to the money laundering alleged in Count Six.

The factual basis for the money laundering alleged in Count Six did not establish that the transferred money was derived from a

specified unlawful activity. Given the insufficient factual basis, the district court plainly erred by accepting Pettit's guilty plea as to that count. This argument is not barred by the appeal waiver, and the Court should vacate the conviction for Count Six.

### A. The appeal waiver does not bar this claim.

Pettit pleaded guilty pursuant to a plea agreement in which he waived his right to appeal his conviction or sentence, subject to limited exceptions. ROA.560–62. Nonetheless, it is well-settled that a defendant cannot waive the right not to be convicted or imprisoned for conduct that does not constitute the charged offense. *See Alvarado-Casas*, 715 F.3d at 951; *United States v. Hildenbrand*, 527 F.3d 466, 474 (5th Cir. 2008).

### B. Standard of review.

Pettit did not object to the factual basis set forth in his plea agreement. Accordingly, this Court's review is for plain error. *United States v. McCall*, 833 F.3d 560, 562 (5th Cir. 2016). To show plain error, Pettit must show (1) an error that is (2) "clear or obvious, rather than subject to reasonable dispute" and that (3) affects his substantial rights. *Puckett*, 556 U.S. at 135. When these prongs are satisfied, this Court exercises its discretion to remedy an error if it "seriously affects the fairness, integrity or public reputation of

judicial proceedings." *Id*. On plain-error review, the Court "may look beyond those facts admitted by the defendant during the plea colloquy and scan the entire record for facts supporting his conviction." *McCall*, 833 F.3d at 563 (cleaned up).

## C. The district court plainly erred by accepting Pettit's guilty plea for Count Six.

"Rule 11 of the Federal Rules of Criminal Procedure was designed to 'ensure that a guilty plea is knowing and voluntary, by laying out the steps a trial judge must take before accepting such a plea.'" *Alvarado-Casas*, 715 F.3d at 949 (quoting *Vonn*, 535 U.S. at 58). "Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). Under this rule, a district court cannot accept a guilty plea unless the court "is satisfied that there is a factual basis for the plea." *Hildenbrand*, 527 F.3d at 474. An adequate factual basis exists when "the factual conduct admitted by the defendant is sufficient as a matter of law to establish a violation of the statute to which he entered his plea." *United States v. Nepal*, 894 F.3d 204, 208 (5th Cir. 2018) (emphasis omitted) (quotation omitted).

To evaluate compliance with Rule 11(b)(3), the Court compares "(1) the conduct to which the defendant admits with (2) the

elements of the offense charged in the indictment or information." *United States v. Marek*, 238 F.3d 310, 315 (5th Cir. 2001) (en banc). The Court's review is not limited to the facts a defendant admitted during the plea colloquy but includes the "entire record for facts supporting" the defendant's guilty plea. *United States v. Trejo*, 610 F.3d 308, 313 (5th Cir. 2010). The Court can also "draw any fair inferences from the evidence." *United States v. Broussard*, 669 F.3d 537, 546 (5th Cir. 2012).

To prove that Pettit engaged in money laundering under § 1957, the government had to show that Pettit "engaged in a monetary transaction in criminally derived property of a value greater than $10,000 and that the property was derived from specified unlawful activity." *United States v. Freeman,* 434 F.3d 369, 377 (5th Cir. 2005); *see also United States v. Fuchs,* 467 F.3d 889, 907 (5th Cir. 2006). A "monetary transaction" is a "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument ... by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1). "Criminally derived property" is "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2).

The government sought conviction on three money laundering counts. Count Six alleged a January 17, 2020 transfer of $800,000 "from an Account in Texas to an Account in California." ROA.23. The factual basis in the plea agreement for the money laundering counts stated that Pettit "did knowingly engage and attempt to engage in monetary transactions, in and affecting interstate and foreign commerce, by and through a financial institution, in criminally derived property of a value greater than $10,000, … such property having been derived from specified unlawful activity, to wit:" wire fraud under § 1343. ROA.559. It then provided the following underlying facts for Count Six: on January 17, 2020, Pettit transferred $800,000 from an unidentified account in Texas to another unidentified account in California to purchase of a Florida property in Pettit's interest. ROA.559.

Those facts establish that Pettit transferred money and spent it. They do not establish that the money transferred was derived from specified unlawful activity. Admitting to the statutory element—that the funds were derived from specified unlawful activity—is not enough. *United States v. Santiago*, 96 F.4th 834, 844 (5th Cir. 2024). To provide an adequate factual basis for a guilty plea, "[t]he record must contain factual allegations indicating that the defendant

committed each element of the crime, rather than mere conclusory statements of the legal elements." *United States v. Jones*, 969 F.3d 192, 196 (5th Cir. 2020).

The remainder of the factual basis does not address any wire fraud that occurred in January 2020. *See* ROA.555–58. Nor does the presentence report. *See* ROA.579–87. The rest of the record does not support that this specific January 2020 transaction was of criminally derived funds either, but the indictment provides a possible clue as to the origin of the allegations. The two dismissed counts involved wire transfers on January 14 and 17, 2020, of $575,000 from a trust account for S.O. to Pettit Frost Estate Management Account. ROA.22. Those counts were, of course, dismissed. ROA.916. Pettit did not admit to those allegations, and no one with the initials S.O. was identified as deserving restitution. *See* ROA.921–25.

Accepting Pettit's guilty plea to Count Six based on an insufficient factual basis was error, and the error was plain. "An error is plain, in this context, if it is 'clear or obvious' what the government must prove to establish the offense, and, notwithstanding that clarity, the district court accepts a defendant's guilty plea without an adequate factual basis." *United States v. Garcia-Paulin,* 627 F.3d

127, 132 (5th Cir. 2010). Here, the elements of money laundering under § 1957 are well established, including that facts must support that the transferred money was derived from a specified unlawful activity. *See United States v. Leahy*, 82 F.3d 624, 635 (5th Cir. 1996) ("in order for a defendant to violate this statute, the funds in question must already be 'proceeds obtained from a criminal offense' when the defendant transfers them"). No facts establish that the $800,000 transferred in Count Six were proceeds from a criminal offense.

This obvious error affected Pettit's substantial rights. Count Six added $100 to Pettit's special assessment and resulted in a concurrent sentence of 60 months. ROA.917, 921. There also is a reasonable probability that he would not have pleaded guilty to Count Six but for the error because the government was willing to dismiss the seemingly related counts of wire fraud and did not seek restitution for S.O. ROA.553, 916, 921–25. It is thus reasonably likely that the government could not prove the funds in Count Six were criminally derived.

The Court should exercise its discretion to vacate the conviction on Count Six. A guilty plea based on facts insufficient to support a conviction "colors the fundamental fairness of the entire

proceeding." *Palmer*, 456 F.3d at 491 (cleaned up); *see United States v. Owens*, 224 F. App'x 429, 430 (5th Cir. 2007) (per curiam) (exercising discretion to correct error of accepting factually insufficient plea). Pettit's factually unsupported conviction—which resulted in a sentence of 60 months, three years' supervised release, and a $100 special assessment—seriously affects the integrity of judicial proceedings. Moreover, the plea was a product of a plea agreement that offered no concrete benefit to Pettit. *See supra* Section I.C.3. Ensuring that a factual basis supports a guilty plea "protect[s] a defendant who may plead with an understanding of the nature of the charge, but without realizing that his conduct does not actually fall within the definition of the crime charged." *United States v. Spruill*, 292 F.3d 207, 215 (5th Cir. 2002). Given the important constitutional rights a defendant waives by pleading guilty, this Court should exercise its discretion to reverse to help promote the integrity or public reputation of judicial proceedings.

## CONCLUSION

For these reasons, the Court should reverse Pettit's convictions and remand for further proceedings.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender


s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of May, 2025, I electronically filed the Brief of Defendant-Appellant with the Clerk of Court using the CM/ECF system which will send notification of such filing to Margaret Leachman, Acting U.S. Attorney for the Western District of Texas (Attn: Assistant U.S. Attorney Zachary C. Richter), via electronic mail.

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
*Attorney for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,501 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook.

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
*Attorney for Defendant-Appellant*

Dated: May 16, 2025